**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| BRIAN MURRAY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THE ULTIMATE SOFTWARE GROUP, INC., SCOTT SCHERR, MARC D. SCHERR, JASON DORSEY, JAMES A. FITZPATRICK, JR., ALOIS T. LEITER, JONATHAN D. MARINER, RICK A. WILBER, UNITE PARENT CORP., UNITE MERGER SUB, INC., THE BLACKSTONE GROUP L.P., GIC PTE. LTD., CANADA PENSION PLAN INVESTMENT BOARD, JMI MANAGEMENT, INC., and HELLMAN & FRIEDMAN LLC, <br><br> Defendants, | Civil Action No. _____ <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMAND** |

**CLASS ACTION COMPLAINT**

Plaintiff Brian Murray ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1. Plaintiff brings this class action on behalf of the public stockholders of The Ultimate Software Group, Inc. ("Ultimate Software" or the "Company") against Ultimate Software's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and

1

SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to an investor group led by Hellman & Friedman LLC, including entities affiliated with The Blackstone Group L.P., GIC Pte. Ltd., Canada Pension Plan Investment Board, and JMI Management, Inc. (collectively the "Investor Group"), through Unite Parent Corp., an entity owned by entities affiliated with Hellman & Friedman LLC, and its wholly-owned subsidiary Unite Merger Sub, Inc.

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on March 11, 2019.  The Proxy recommends that Ultimate Software shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby Ultimate Software is acquired by the Investor Group.  The Proposed Transaction was first disclosed on February 4, 2019, when Ultimate Software and the Investor Group announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which the Investor Group will acquire all of the outstanding shares of common stock of Ultimate Software for $331.50 per share (the "Merger Consideration").  The deal is valued at approximately $11 billion and is expected to close in the middle of 2019.

3.      Ultimate Software has more than doubled its revenues and gross profits over the last five years, and its stock price has almost doubled in that same time period.  When Hellman & Friedman expressed interest in a potential transaction, Scott Scherr, the CEO, President and Chairman of the Board, made it clear that the only transaction Ultimate Software would agree to would include an opportunity for senior management and other employees to own equity in the Company.  Hellman & Friedman apparently agreed to that condition, discussing the structure of an equity program on numerous occasions with members of Ultimate Software's senior

management in December 2018 and January 2019. When Scott Scherr and his brother, the Vice Chairman of the Board and former Chief Operating Officer, informed the other members of the Board of Hellman & Friedman's interest, there was no discussion of not moving forward with a potential transaction with Hellman & Friedman. Instead, three weeks later, the Merger Agreement was approved.

4. To push the Proposed Transaction forward, the Board approved issuance of the Proxy, which is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Ultimate Software management, as well as the financial analyses conducted by Goldman Sachs & Co. LLC ("Goldman Sachs"), Ultimate Software's financial advisor.

5. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to Ultimate Software's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to Ultimate Software's shareholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

**PARTIES**

6. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Ultimate Software.

7. Defendant Ultimate Software is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 2000 Ultimate Way, Weston, FL 33326. Ultimate Software common stock trades on NASDAQ under the ticker symbol "ULTI."

8. Defendant Scott Scherr has been President and CEO of the Company and Chairman of the Board since 1996.

9. Defendant Marc D. Scherr has been Vice Chairman of the Board since 1998 and a director of the Company since 1996. Defendant Marc Scherr served as Chief Operating Officer of the Company from 2003 until October 26, 2018 and is the brother of Defendant Scott Scherr.

10. Defendant Jason Dorsey has been a director of the Company since 2017.

11. Defendant James A. FitzPatrick, Jr. has been a director of the Company since 2000.

12. Defendant Alois T. Leiter has been a director of the Company since 2006.

13. Defendant Jonathan D. Mariner has been a director of the Company since 2017.

14. Defendant Rick A. Wilber has been a director of the Company since 2002.

15. Defendants Scott Scherr, Marc Scherr, Dorsey, FitzPatrick, Leiter, Mariner and Wilber are collectively referred to herein as the "Board."

16. Defendant The Blackstone Group L.P. is a Delaware limited partnership with its principal executive offices at 345 Park Avenue, New York, New York 10154.

17. Defendant GIC Pte. Ltd. is a sovereign wealth fund responsible for managing most of the financial assets of the Singapore government.

18. Defendant Canada Pension Plan Investment Board was created by the Canadian government to invest funds held by the Canada Pension Plan.

19. Defendant JMI Management, Inc. is an equity firm with offices in Baltimore,

Maryland and San Diego, California.

20. Defendant Hellman & Friedman LLC is a private equity firm with offices in San Francisco, California, New York, New York and London, United Kingdom.

21. Defendant Unite Parent Corp. is a Delaware corporation formed by entities affiliated with Hellman & Friedman LLC.

22. Defendant Unite Merger Sub, Inc. is a Delaware corporation and an indirect wholly owned subsidiary of Unite Parent Corp. that was formed by entities affiliated with Hellman & Friedman LLC.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

24. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

25. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; and (ii) Ultimate Software is incorporated in this District.

## CLASS ACTION ALLEGATIONS

26. Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Ultimate Software common stock and their successors in interest and/or their

transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

27. This action is properly maintainable as a class action for the following reasons:

(a) The Class is so numerous that joinder of all members is impracticable. As of February 1, 2019, Ultimate Software had approximately 35.9 million shares outstanding.

(b) Questions of law and fact are common to the Class, including, inter alia, the following:

    (i) Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

    (ii) Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

    (iii) Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

    (iv) Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

    (v) whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

       (c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

       (d)    Plaintiff's claims are typical of those of the other members of the Class.

       (e)    Plaintiff has no interests that are adverse to the Class.

       (f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

       (g)    Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

       (h)    Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FURTHER SUBSTANTIVE ALLEGATIONS**

**A. The Board Agrees to Sell the Company In a Three-Week Long Sales Process**

28.    Ultimate Software, which was formed in 1990, provides human capital management software, products related to benefits management, talent acquisition, payroll, and time management. By the end of 2018, Ultimate Software had more than 5,600 customers, with products available in 14 languages with 61 country-specific localizations.

29.    The Company has seen impressive growth over the last five years, with revenues and gross profits more than doubling between fiscal year 2014 and fiscal year 2018. The same is true of Ultimate Software's stock price, which has increased from $152.43 per share at closing on January 2, 2014 to $277.83 per share at closing on February 1, 2019:



30.     Despite strong growth, the Board agreed to sell the Company just three weeks after learning of Hellman & Friedman's interest in a potential transaction.  Hellman & Friedman first expressed interest in a take-private transaction with Ultimate Software in February 2018. Over the next six months, Hellman & Friedman consistently approached Ultimate Software's senior management to see if the Company would also be interested in such a transaction.  In August 2018, Defendant Scott Scherr finally reciprocated interest, but with a catch: any transaction would need to include the ability for Ultimate Software employees, including members of senior management like Defendants Scott and Marc Scherr, to own equity in the Company post-closing.

31.     A transaction that included equity ownership was not of interest to Hellman & Friedman. At least, until December 2018.  While Hellman & Friedman suggested a private investment in public equity transaction on December 21, 2018, members of the Company's senior management preferred a take-private transaction.  Defendant Scott Scherr informed Hellman & Friedman to perform due diligence on Ultimate Software if it was for a take-private transaction. The parties entered into a non-disclosure agreement on December 31, 2018, and on January 9, 2019, Hellman & Friedman and Defendants Scott and Marc Scherr discussed options for equity

8

ownership in Ultimate Software after a take-private transaction.

32. At this point, the Board (beyond Defendants Scott and Marc Scherr) was in the dark on the discussions with Hellman & Friedman. It was not until January 11, 2019 that the members of the Board learned about the discussions, when Defendants Scott and Marc Scherr called the members of the Board separately. When the Board met two days later without Defendants Scott and Marc Scherr, there was no discussion of not considering the potentially forthcoming offer from Hellman & Friedman. Instead, the Board discussed preventing a leak of the potential transaction and timing of such a transaction.

33. Hellman & Friedman made its first proposal to acquire the Company on January 20, 2019. Over the next two weeks, the Board equivocated over performing a market check and requesting a go-shop period, believing that there was no time to adequately perform a market check. It was not until January 29, 2019 that the Board decided on a go-shop period. Five days later, just three weeks after learning of Hellman & Friedman's interest in a potential transaction, the Board approved the Merger Agreement.

**B. Ultimate Software's Officers Stand to Receive Benefits Unavailable to the Class**

34. The Proxy acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

35. Restricted stock and restricted stock units that have been awarded to and are held by Ultimate Software's executive officers and directors will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards pursuant to Ultimate Software's Amended and Restated 2005 Equity and Incentive Plan and the Merger Agreement, will create a windfall for Ultimate Software's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, the executive

9

officers of Ultimate Software in total stand to receive up to $168.2 million after the Proposed Transaction closes:

| Named Executive Officer | Cash | Equity | Perquisites / Benefits | Total |
|---|---|---|---|---|
| Scott Scherr | — | $36,716,277.00 | — | $36,716,277.00 |
| Felicia Alvaro | — | $13,923,331.50 | — | $13,923,331.50 |
| Mitch Dauerman | — | $13,184,749.50 | — | $13,184,749.50 |
| Adam Rogers | — | $16,022,721.00 | — | $16,022,721.00 |
| Julie Dodd | — | $12,707,721.00 | — | $12,707,721.00 |
| Greg Swick | — | $9,668,860.50 | — | $9,668,860.50 |
| The executive officers who are not named executive officers | — | $65,999,992.50 | — | $65,999,992.50 |

36. In addition, a condition to any transaction between Ultimate Software and Hellman & Friedman was a program to allow senior management and other employees to own equity in the Company post-closing. While such an equity program does not appear to have been agreed to at this point, it was discussed in depth numerous times, including in early January 2019. An equity program would allow the executive officers of Ultimate Software, including Defendant Scott Scherr, to maintain their ownership of Ultimate Software while the public stockholders are cashed out.

**C. The Preclusive Deal Protection Devices**

37. As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge. For example, pursuant to section 5.2(c)(i) of the Merger Agreement, the Company must notify the Investor Group of any offer, indication of interest, or request for information made by an unsolicited bidder. Thereafter, should the Board determine that the unsolicited offer is superior, section 5.2(c)(ii) requires that the Board grant the Investor Group five (5) business days to negotiate the terms of the Merger Agreement to render the superior proposal no longer superior. The Investor Group is

able to match the unsolicited offer because, pursuant to section 5.2(c)(i) of the Merger Agreement, the Company must provide the Investor Group with the identity of the party making the proposal and the material terms of the superior proposal, eliminating any leverage that the Company has in receiving the unsolicited offer.

38. In other words, the Merger Agreement gives the Investor Group access to any rival bidder's information and allows the Investor Group a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for Ultimate Software, because the Merger Agreement unfairly assures that any "auction" will favor the Investor Group and allow the Investor Group to piggy-back upon the due diligence of the foreclosed second bidder.

39. In addition, pursuant to section 7.5(b) of the Merger Agreement, Ultimate Software must pay the Investor Group a termination fee of $330 million if the Company decides to pursue another offer after the go-shop period ends on March 25, 2019, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

40. Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of the Investor Group's inadequate offer price.

**D. The Materially Incomplete and Misleading Proxy**

41. On March 11, 2019, Defendants filed the Proxy with the SEC. The purpose of the Proxy is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, Ultimate Software shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

*Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

42. The Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Proxy indicates that in connection with the rendering of Goldman Sachs's fairness opinion, Goldman Sachs reviewed "certain internal financial analyses and forecasts for the Company prepared by its management . . .." Accordingly, the Proxy should have, but failed to, provide certain information in the projections that Ultimate Software's management provided to the Board and Goldman Sachs.

43. Notably, Defendants failed to disclose the financial projections for Ultimate Software for fiscal years 2019 to 2028 for: costs of recurring and services revenues; sales and marketing, research and development, and general and administrative expenses; stock-based compensation expense; capital expenditures; capitalized software costs; changes in working capital; and cash taxes. This omitted information is necessary for Ultimate Software stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

*Materially Incomplete and Misleading Disclosures Concerning Goldman Sachs's Financial Analyses*

44. With respect to the *Discounted Cash Flow Analysis,* the Proxy fails to disclose the individual inputs and assumptions utilized by Goldman Sachs to derive the discount rate range of

12

8.00% to 9.00%. The Proxy further fails to disclose the specific terminal year estimate of free cash flow metric to which the selected perpetuity growth rates were applied for purposes of this analysis.

45. With respect to the *PV Future Share Price Analysis*, the Proxy fails to disclose the companies included in the "selected publicly traded companies in the software industry" utilized by Goldman Sachs and the individual multiples and metrics observed for each of those companies. The Proxy also fails to disclose the projections of net debt and fully-diluted shares outstanding for years 2019 to 2021 as used in this analysis.

46. With respect to the *Selected Transactions Analysis,* the Proxy fails to disclose whether Goldman Sachs performed any type of benchmarking analysis for Ultimate Software in relation to the target companies of the selected transactions.

*Materially Incomplete and Misleading Disclosures Concerning the Flawed Process*

47. The Proxy also fails to disclose material information concerning the sales process. For example, the Proxy notes that "certain members of senior management" preferred a take-private transaction to a private investment in public equity transaction. On that basis, Scott Scherr decided to pursue a take-private transaction. Yet the Proxy does not disclose the identity or positions of those certain members of senior management.

48. The Proxy notes that on January 8, 2019, Mitch Dauermann informed Hellman & Freidman that Scott Scherr did not believe a transaction was worth pursuing if Hellman & Friedman did not offer at least as much as Ultimate Software's highest share price. The Proxy does not disclose the basis for that proposed merger consideration.

49. On January 25, 2019, according to the Proxy, Marc Scherr spoke with Hellman & Friedman about the employment of members of the Company's senior management after the

Proposed Transaction closed. The Proxy does not disclose whether the employment of either Marc or Scott Scherr was discussed at that meeting, whether this was the first time post-transaction employment had been discussed, or whether the Board was aware of such discussions before agreeing to the Proposed Transaction.

50. The Company's financial advisor provided a number of analyses to the Board prior to the entry of the Merger Agreement. However, those analyses were not disclosed, including: (a) the preliminary analysis of the January 20, 2019 proposal as reviewed at the January 21, 2019 meeting of the non-management directors; (b) the preliminary financial analysis of Ultimate as reviewed at the Board meeting on January 24, 2019; (c) the preliminary financial analysis of the Company and the proposal from January 28, 2019 as reviewed at the January 28, 2019 Board meeting; (d) the preliminary financial analysis of the Company and the January 28, 2019 proposal as reviewed at the January 29, 2019 Board meeting, and how it differed from the analyses reviewed at the January 28, 2019 Board meeting; (e) the preliminary financial analysis of the Company and the February 1, 2019 proposal as reviewed at the February 1, 2019 meeting of non-management directors; and (f) the preliminary financial analysis of the Company and the February 2, 2019 proposal as reviewed at the February 2, 2019 meeting of the non-management directors.

51. Finally, Goldman Sachs' opinion letter states that Goldman Sachs had not provided financial advisory or underwriting services to the Company "for which Goldman Sachs has recognized compensation." The Proxy states that from 2014 onward, Goldman Sachs had provided updates to the Company's senior management on the industry and capital markets trends. There is no mention of any fees paid to Goldman Sachs regarding such updates, nor whether Goldman Sachs performed any other services for the Company in the two years preceding the signing of the Merger Agreement.

52.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.  And without all material information, Ultimate Software stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

53.     In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

54.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC.  Indeed, as directors of the Company, they were required to do so.  The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

55.     Further, the Proxy indicates that on February 3, 2019, Goldman Sachs reviewed with the Board its financial analysis of the Merger Consideration and delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to Ultimate Software shareholders.  Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Goldman Sachs's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

56.     Plaintiff and the other members of the Class are immediately threatened by the

wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

57. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58. Defendants have filed the Proxy with the SEC with the intention of soliciting Ultimate Software shareholder support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

59. In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Ultimate Software, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

60. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

61. Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-

9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of Ultimate Software shares and the financial analyses performed by Goldman Sachs in support of its fairness opinion; and (iii) the sales process.

62. Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Goldman Sachs reviewed and discussed its financial analyses with the Board during various meetings including on February 3, 2019, and further states that the Board relied upon Goldman Sachs's financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

63. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

64. Plaintiff incorporates each and every allegation set forth above as if fully set forth

.
.
.

herein.

65. The Individual Defendants acted as controlling persons of Ultimate Software within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Ultimate Software and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

66. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

68. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants

reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

69. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

70. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to Ultimate Software shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

     D.     In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

     E.     Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

     F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

     G.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 19, 2019

**RIGRODSKY & LONG, P.A.**

By: */s/ Brian D. Long*
Brian D. Long (#4347)
Gina M. Serra (#5387)
300 Delaware Avenue, Suite 1220
Wilmington, Delaware 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Telephone: (914) 400-1920
Facsimile: (914) 301-3514